JUDGE ABRAMS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

12 CIV 5383

| | |
|---|---|
| TIFFANY AND COMPANY; LILI DIAMONDS USA INC.; RONNIE ROUBIN; GRAFF DIAMONDS (U.S.A.) INC. n/k/a GRAFF DIAMONDS (NEW YORK) INC.; OSCAR HEYMAN INC.; FISCHER DIAMONDS INC.; and V.F. DIAMONDS LTD.,<br><br><div align="center">Plaintiffs,</div><br><div align="center">- against -</div><br>WM. V. SCHMIDT CO., INC and RICHARD WEINTRAUB,<br><br><div align="center">Defendants.</div> | Civil Action No. _____<br><br>**COMPLAINT**<br><br>**No Jury Trial Demanded** |



Plaintiffs Tiffany and Company and its subsidiaries, affiliates and divisions, including without limitation Laurelton Diamonds ("Tiffany"); LILI Diamonds USA Inc. ("Lili"); Ronnie Roubin ("Roubin"); Graff Diamonds (U.S.A.) Inc. n/k/a Graff Diamonds (New York) Inc. ("Graff"); and Oscar Heyman Inc. ("Heyman"), by their attorneys Gibbons P.C., and plaintiffs Fischer Diamonds Inc. ("Fischer") and V.F. Diamonds, Ltd. ("VFD"), by their attorney Ben Kinzler, Esq. (all of the foregoing plaintiffs referred to collectively as "Plaintiffs"), for their Complaint against defendants Wm. V. Schmidt Co., Inc. ("Schmidt") and Richard Weintraub ("R. Weintraub") (collectively, the "Defendants"), allege as follows:

<div align="center"><b><u>NATURE OF THE ACTION</u></b></div>

1.      This action arises from (a) Schmidt's failure to pay a total of not less than $4,304,073.70 due and owing to various of the Plaintiffs pursuant to the Plaintiffs' sale or consignment of numerous diamonds, other gemstones, and/or jewelry items

(collectively, "Stones") to or with Schmidt, all as detailed further below; (b) the fraud/or the aiding and abetting of fraudulent acts perpetrated by each of the Defendants and M. Douglas Weintraub ("D. Weintraub")[1] upon each of the Plaintiffs and numerous other gem and jewelry merchants discussed below who are not plaintiffs ("Other Merchants") in inducing the Plaintiffs and the Other Merchants to deliver the Stones under various invoices and memoranda at times when the Defendants and D. Weintraub held the present intent to default in their payment obligations to each of the Plaintiffs and the Other Merchants and to defraud the Plaintiffs and the Other Merchants and convert the Stones to the use and benefit of Defendants and D. Weintraub; (c) R. Weintraub's resulting personal liability for Schmidt's debts as R. Weintraub and D. Weintraub so dominated and abused the corporate form of Schmidt to perpetrate said fraud as to render Schmidt, R. Weintraub's mere instrumentality and alter ego; (d) the Defendants' and D. Weintraub's civil conspiracy to defraud the Plaintiffs and convert the Stones for the Defendants' and D. Weintraub's use and benefit; (e) the Defendants' racketeering in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.*, under 18 U.S.C. § 1964 and/or state law counterparts, and (f) the Defendants' misappropriation of millions of dollars worth of Stones, all in violation of the Defendants' and D. Weintraub's contractual and other legal obligations to the Plaintiffs, individually and collectively.

---

[1] On December 1, 2011, D. Weintraub filed a chapter 11 petition in the United States Bankruptcy Court for the Southern District of New York commencing a bankruptcy case captioned In re Weintraub, Case No.11-15499-jmp.  The Plaintiffs seek a nondischargeability determination as to D. Weintraub's obligations to Plaintiff as set forth herein pursuant to 11 U.S.C. § 523.

#1582531 v2
099998-00004

2.      By reason of the Defendants' and D. Weintraub's unlawful conduct, the Defendants are liable to the Plaintiffs in the aggregate amount of not less than $4,304,073.70 plus interest, expenses and attorneys' fees.  In addition, the Defendants and D. Weintraub conspired to defraud the Plaintiffs by the use of mail fraud, wire fraud and other predicate acts so that the Defendants have violated the federal and/or state RICO statutes.  Accordingly, each of the Defendants is liable to each of the Plaintiffs for treble damages.

## PARTIES

3.      Plaintiff Tiffany is a New York corporation maintaining a principal place of business located at 200 Fifth Avenue, New York, New York 10010.

4.      Plaintiff Lili is a New York corporation maintaining a principal place of business located at 580 Fifth Avenue, New York, New York 10036.

5.      Plaintiff Roubin is an individual resident in New York maintaining a principal place of business located c/o P.O. Box 684, Gracie Station, New York, New York 10028.

6.      Plaintiff Graff is a New York corporation maintaining a principal place of business located at 46 East 61st Street, New York, New York 10065.

7.      Plaintiff Heyman is a New York corporation maintaining a principal place of business located at 501 Madison Avenue, New York, New York 10022.

8.      Plaintiff Fischer is a New York corporation maintaining a principal place of business located at 1212 Avenue of the Americas, New York, New York 10036.

9.      Plaintiff VFD is an Israeli limited company maintaining a principal place of business located at 54 Bezalel Street, Diamond Exchange, Hayahalom Building, Suite 5049, Ramat Gan, 52521, Israel.

#1582531 v2
099998-00004

10.     Defendant Schmidt is a New York corporation maintaining or having maintained a principal place of business located at 589 Fifth Avenue, New York, New York 10017.

11.     Defendant R. Weintraub is an individual resident in New York maintaining a residence located at 1365 York Avenue, Apt. 8F, New York, New York 10021.

## JURISDICTION AND VENUE

12.     Plaintiffs' claims under the Federal Racketeer Influence and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. confer federal question jurisdiction over the claims asserted herein upon the United States District Court for the Southern District of New York, and said Court can assert pendent jurisdiction over the Plaintiffs' remaining state law claims as the same arise from a common nucleus of operative fact as the RICO federal question such that Plaintiffs would be expected to assert all claims asserted herein in a single judicial proceeding.

13.     Venue is proper laid in the United States District Court for the Southern District of New York because each of the Plaintiffs maintains principal places of business and/or transacts business in this District, and each of the Defendants is resident in and/or transacts or transacted business in this District at various times relevant to the claims alleged herein.

14.     The predicate acts complained of herein involve interstate commerce and the interstate, intrastate and international use of the United States mails and electronic communications, and mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

#1582531 v2
099998-00004

## FACTUAL ALLEGATIONS

15.     Each of the Plaintiffs delivered Stones to Schmidt under various invoices, memoranda and/or consignment agreements.  As detailed below, Schmidt has failed and refused to pay to each of the Plaintiffs the invoiced or other contractual prices for said deliveries and is in breach of its obligations for the same.

16.     Each of Schmidt and R. Weintraub, acting in concert with D. Weintraub, have converted the Stones delivered by Plaintiffs as further detailed below, have conspired to convert the Stones to their use and benefit, have conspired to defraud the Plaintiffs, and have engaged in a pattern and practice of fraud that violates RICO.

## FIRST CAUSE OF ACTION
### (Breach Of Contract By Tiffany)

17.     Plaintiffs re-allege and incorporate by reference the foregoing paragraphs of the Complaint as if set forth fully herein.

18.     Pursuant to a Detail Invoice dated November 6, 2009, Tiffany's Laurelton Diamonds division sold and delivered to Schmidt an 8.25 carat diamond bearing Gemological Institute of America ("GIA") No. 12150627 and having an invoiced value of $891,000.  Schmidt accepted and did not refuse delivery of said diamond under the terms of said invoice, and therefore became contractually obligated to pay to Tiffany the invoice price of $891,000 according to the invoice's terms, which indicate that payment was due 45 days from the invoice date, or on December 20, 2009.

19.     Pursuant to a Detail Invoice dated November 6, 2009 (this invoice and the invoice referenced in the prior paragraph being referred to herein as the "Tiffany Invoices"), Tiffany's Laurelton Diamonds division sold and delivered to Schmidt a 6.62 carat diamond bearing GIA No. 12972350 and having an invoiced value of

#1582531 v2
099998-00004

$615,163.50. Schmidt accepted and did not refuse delivery of said diamond under the terms of said invoice, and therefore became contractually obligated to pay to Tiffany the invoice price of $615,163.50 according to the invoice's terms, which indicate that payment was due 45 days from the invoice date, or on December 20, 2009.

20.    Tiffany has fully performed its obligations under the aforesaid invoices.

21.    Schmidt has failed and refused to remit payment of the $1,506,163.50 called for under the Tiffany Invoices, which form a contract between Tiffany and Schmidt requiring Schmidt's payment of the invoiced amounts.

22.    Schmidt's failure to pay to Tiffany the invoiced amounts on December 20, 2009 constitutes a breach of the contracts created by the Tiffany Invoices.

23.    As a result of Schmidt's breach of its contractual obligations, Tiffany has sustained damages in the amount of $1,506,163.50 plus interest, expenses and attorneys' fees under the Tiffany Invoices.

<div align="center">

**SECOND CAUSE OF ACTION**
**(Breach Of Contract By Lili)**

</div>

24.    Plaintiffs re-allege and incorporate by reference the foregoing paragraphs of the Complaint as if set forth fully herein.

25.    Pursuant to an invoice dated September 28, 2006, Lili sold and delivered to Schmidt a total of 19 diamonds weighing a total of 23.12 carats and having an invoiced price of $111,670.80. Schmidt paid a total of $78,791.42 on said invoice, leaving $32,879.38 remaining outstanding and due thereunder. Schmidt accepted and did not refuse delivery of said diamonds under the terms of said invoice.

26.    Pursuant to an invoice dated October 19, 2006, Lili sold and delivered to Schmidt a total of 95 diamonds weighing a total of 34.39 carats and having an

#1582531 v2
099998-00004

invoiced price of $71,093.68, which amount remains outstanding and due. Schmidt accepted and did not refuse delivery of said diamonds under the terms of said invoice.

27.    Pursuant to an invoice dated October 25, 2006, Lili sold and delivered to Schmidt a total of 10 diamonds weighing a total of 11.78 carats and having an invoiced price of $49,773.90, which amount remains outstanding and due. Schmidt accepted and did not refuse delivery of said diamonds under the terms of said invoice.

28.    Pursuant to an invoice dated December 15, 2006, Lili sold and delivered to Schmidt a total of 6 diamonds weighing a total of 7.94 carats and having an invoiced price of $33,724.55, which amount remains outstanding and due. Schmidt accepted and did not refuse delivery of said diamonds under the terms of said invoice.

29.    Pursuant to an invoice dated December 15, 2006, Lili sold and delivered to Schmidt a 1.34 carat diamond and having an invoiced price of $7,738.50, which amount remains outstanding and due. Schmidt accepted and did not refuse delivery of said diamonds under the terms of said invoice.

30.    Pursuant to an invoice dated February 8, 2007, Lili sold and delivered to Schmidt a total of 9 diamonds weighing a total of 11.82 carats and having an invoiced price of $51,186.75, which amount remains outstanding and due. Schmidt accepted and did not refuse delivery of said diamonds under the terms of said invoice.

31.    Pursuant to an invoice dated February 21 2007, Lili sold and delivered to Schmidt a total of 172 diamonds weighing a total of 69.57 carats and having an invoiced price of $153,313.95, which amount remains outstanding and due. Schmidt accepted and did not refuse delivery of said diamonds under the terms of said invoice.

#1582531 v2
099998-00004

32.    Pursuant to an invoice dated April 17, 2007, Lili sold and delivered to Schmidt a total of 5 diamonds weighing a total of 5.90 carats and having an invoiced price of $27,176.60, which amount remains outstanding and due.  Schmidt accepted and did not refuse delivery of said diamonds under the terms of said invoice.

33.    Pursuant to a memorandum dated October 30, 2006, Lili sold and delivered to Schmidt a total of 110 diamonds weighing a total of 47.29 carats and having a value of $111,119.11, which amount remains outstanding and due.  Schmidt accepted and did not refuse delivery of said diamonds under the terms of said invoice.

34.    Pursuant to a memorandum dated March 23, 2007, Lili sold and delivered to Schmidt a total of 9 diamonds weighing a total of 10.92 carats and having a value of $47,348.25, which amount remains outstanding and due.  Schmidt accepted and did not refuse delivery of said diamonds under the terms of said invoice.

35.    Pursuant to a memorandum dated April 13, 2007, Lili sold and delivered to Schmidt one diamond weighing a total of 1.47 carats and having an invoiced price of $6,725.25, which amount remains outstanding and due.  Schmidt accepted and did not refuse delivery of said diamonds under the terms of said invoice.

36.    Lili has fully performed its obligations under the aforesaid invoices.

37.    Schmidt has failed and refused to remit payment of the $592,080.20 called for under Lili's invoices and memoranda detailed above, which form contracts between Lili and Schmidt requiring Schmidt's payment of the unpaid amounts.

38.    Schmidt's failure to pay to Lili the unpaid amounts constitutes a breach of the contracts created by the Lili's invoices and memoranda.

8

39.     As a result of Schmidt's breach of its contractual obligations, Lili has sustained damages in the amount of $592.080.20 plus interest, expenses and attorneys' fees under Lili's invoices and memoranda.

## THIRD CAUSE OF ACTION
### (Breach Of Contract By Roubin)

40.     Plaintiffs re-allege and incorporate by reference the foregoing paragraphs of the Complaint as if set forth fully herein.

41.     Pursuant to a verbal agreement between Roubin and Schmidt, Roubin, acting as an agent and/or broker for Schmidt, purchased two pairs of diamond earrings.  Roubin purchased one pair from Gordon J. Bares Inc. ("Bares"), as follows: Pursuant to a memorandum dated March 15, 2010 ("Bares Memorandum"), Bares delivered to Roubin a pair of diamond earrings ("Bares Earrings") with a value of $56,745, consisting of 2 diamonds, one weighing 1.53 carats and bearing GIA No. 13572873, and the other weighing 1.52 carats and bearing GIA No. 13450506 and 16 smaller diamonds with a total weight of 6.81 carats.

42.     Pursuant to an invoice dated March 22, 2010, ("Bares Invoice"), Bares sold the Bares Earrings referenced in the Bares Memorandum to Roubin for a purchase price of $56,745, due 30 days from the invoice date or April 21, 2010.  On the same day, Roubin sold the Bares Earrings to Schmidt for a net price of $61,440.

43.     Roubin, acting as agent and/or broker for Schmidt, purchased a second pair of diamond earrings from Louis Newman Diamonds ("Newman"), as follows: Pursuant to a memorandum (the "Newman Memorandum"), Newman delivered to Roubin a pair of diamond earrings with a value of $76,500 ("Newman Earrings").

9

44.     Pursuant to an invoice ("Newman Invoice"), Newman sold the Newman Earrings referenced in the Newman Memorandum to Roubin for a purchase price of $76,500.  On March 22, 2010, Roubin sold the Newman Earrings to Schmidt for a net price of $81,000.

45.     Bares, Newman, and Roubin have fully performed their obligations under the verbal agreement between Roubin and Schmidt, the Bares Memorandum, the Bares Invoice, the Newman Memorandum and the Newman Invoice.

46.     Schmidt has failed and refused to remit payment of the $142,440 called for under the Bares and Newman Invoices or return the Stones called for under the Bares and Newman Memoranda, which, together with Schmidt's verbal agreement with Roubin to pay for said Stones, form a contract between Roubin and Schmidt requirng Schmidt's payment of the sales price or return of the Stones.

47.     Schmidt's failure to pay to Roubin the invoiced amounts or return the Stones constitutes a breach of the contracts created as aforesaid.

48.     As a result of Schmidt's breach of its contractual obligations, Roubin has sustained damages in the amount of $142,440 plus interest, expenses and attorneys' fees under the contracts created as aforesaid.

### FOURTH CAUSE OF ACTION
### (Breach Of Contract By Graff)

49.     Plaintiffs re-allege and incorporate by reference the foregoing paragraphs of the Complaint as if set forth fully herein.

50.     Pursuant to a Memorandum dated September 2, 2009 ("Graff Memorandum"), Graff sold and delivered to Schmidt an 8.86 carat diamond ring bearing Item No. GR00015070 and having an invoiced value of $975,000.  Schmidt

#1582531 v2
099998-00004

accepted and did not refuse delivery of said diamond under the terms of the Graff Memorandum, and therefore became contractually obligated to pay to Graff $975,000. Schmidt made certain payments to Graff totaling $675,000, reducing the outstanding amount due under the Graff Memorandum to $300,000.

51.    Graff has fully performed its obligations under the Graff Memorandum.

52.    Schmidt has failed and refused to remit payment of the remaining $300,000 due for under the Graff Memorandum, which forms a contract between Graff and Schmidt requiring Schmidt's payment of the remaining $300,000 to Graff.

53.    Schmidt's failure to pay to Graff said $300,000 constitutes a breach of the contract created by the Graff Memorandum.

54.    As a result of Schmidt's breach of its contractual obligations, Graff has sustained damages in the amount of $300,000 plus interest, expenses and attorneys' fees under the Graff Memorandum.

## FIFTH CAUSE OF ACTION
### (Breach Of Contract By Heyman)

55.    Plaintiffs re-allege and incorporate by reference the foregoing paragraphs of the Complaint as if set forth fully herein.

56.    Pursuant to a memorandum dated March 11, 2010 ("Heyman Memorandum"), Heyman delivered to Schmidt two pairs of diamond earrings, one having a value of $50,000 and the other having an value of $45,000, for a total value of $95,000.  Schmidt accepted and did not refuse delivery of said diamonds under the terms of the Heyman Memorandum.

57.    Pursuant to an Invoice dated March 31, 2010 ("Heyman Invoice"), Heyman sold to Schmidt the two pairs of earrings referenced in the Heyman

11

#1582531 v2
099998-00004

Memorandum for a total invoice amount of $95,000.  Schmidt accepted and purchased said earrings under the terms of the Heyman Invoice, and therefore became contractually obligated to pay to Heyman the invoice price of $95,000.

58.     Heyman has fully performed its obligations under the Heyman Memorandum and the Heyman Invoice.

59.     Schmidt has failed and refused to remit payment of the $95,000 called for under the Heyman Invoice and Heyman Memorandum, which form a contract between Heyman and Schmidt requiring Schmidt's payment of the invoiced amount.

60.     Schmidt's failure to pay to Heyman the invoiced amount constitutes a breach of the contract created by the Heyman Invoice and the Heyman Memorandum.

61.     As a result of Schmidt's breach of its contractual obligations, Heyman has sustained damages in the amount of $95,000 plus interest, expenses and attorneys' fees under the Heyman Invoice.

## SIXTH CAUSE OF ACTION
### (Breach Of Contract By Fischer)

62.     Plaintiffs re-allege and incorporate by reference the foregoing paragraphs of the Complaint as if set forth fully herein.

63.     Pursuant to an Invoice dated September 2, 2009 (the "Fischer Invoice"), Fischer sold and delivered to Schmidt a 4.32 carat diamond bearing GIA No. 15844038 and having an invoiced value of $99,360.  Schmidt accepted and did not refuse delivery of said diamond under the terms of the Fischer Invoice, and therefore became contractually obligated to pay to Fischer the invoice price of $99,360 according to the invoice's terms, which indicate that payment was due 30 days from the invoice date, or on October 2, 2009.

#1582531 v2
099998-00004

64. Fischer has fully performed its obligations under the Fischer Invoice.

65. After taking into account one $15,000 payment made by Schmidt on the Fischer Invoice, the sum of $74,360 remains due from Schmidt to Fischer.

66. Schmidt has failed and refused to remit payment of the $74,360 remaining due under the Fischer Invoice, which forms a contract between Fischer and Schmidt requiring Schmidt's payment of the said amount.

67. Schmidt's failure to pay to Fischer the remaining amount due constitutes a breach of the contract created by the Fischer Invoice.

68. As a result of Schmidt's breach of its contractual obligations, Fischer has sustained damages in the amount of $74,360 plus interest, expenses and attorneys' fees under the Fischer Invoices.

69. On March 5, 2010, D. Weintraub, signed a promissory note (the "Fischer Note"), promising to pay Fischer the sum of $50,000 on or before March 23, 2010 and the balance of $24,360 on or before April 20, 2010.  The Fischer Note represents D. Weintraub's personal promise and guarantee of payment.

70. Upon information and belief, at the time D. Weintraub signed the Fischer Note, he had the present intent to not pay amounts due thereunder, and he intended the delivery of the Fischer Note to hinder, delay and defraud Fischer and its efforts to collect amounts due.

71. D. Weintraub has failed and refused to remit payment of the amounts due under the Fischer Note, which forms a contract between Fischer and D. Weintraub requiring D. Weintraub's payment of the amount due thereunder.

#1582531 v2
099998-00004

72.     D. Weintraub's failure to pay to Fischer the amounts owed under the Fischer Note constitutes a breach of the contract created by the Fischer Note.

73.     As a result of the Defendants and D. Weintraub's breaches of their contractual obligations, Fischer has sustained damages in the amount of $74,360 plus interest, expenses and attorneys' fees pursuant to the Fischer Invoice and the Fischer Note. As detailed below, in June 2010, Fischer obtained a judgment against D. Weintraub in said amount based upon the Fischer Note.

## SEVENTH CAUSE OF ACTION
### (Breach Of Contract By VFD)

74.     Plaintiffs re-allege and incorporate by reference the foregoing paragraphs of the Complaint as if set forth fully herein.

75.     As of approximately February 2009, VFD had sold and delivered to Schmidt Stones having an aggregate value of $900,000, which amount remained unpaid as of that date, under a variety of invoices.

76.     In purported repayment of said debt, between February 2009 and May 2010, Schmidt issued and delivered to VFD by U.S. Mail or comparable commercial common courier service eighteen post-dated checks to VFD ("VFD Checks") in the amount of $50,000 each, or totaling $900,000. The VFD Checks were delivered to VFD by Schmidt, purportedly as payment for the Stones that had been sold and invoiced as aforesaid, but the VFD Checks were never honored because Schmidt's account did not have sufficient funds or payment was otherwise stopped. In fact, Schmidt issued and delivered the VFD Checks to VFD via mail in order to induce VFD to continue to deliver Stones to Schmidt as set forth below. As such, by delivering the

#1582531 v2
099998-00004

VFD Checks, Schmidt specifically represented to VFD that Schmidt was viable, solvent and able to pay its debts as they came due.

77.    The check number, date and amount of the VFD Checks are summarized below:

| Check date | Check Number | Amount |
|---|---|---|
| 2/13/2009 | 1012 | $50,000 |
| 3/6/2009 | 1052 | $50,000 |
| 3/27/2009 | 1099 | $50,000 |
| 4/17/2009 | 1100 | $50,000 |
| 5/8/2009 | 1169 | $50,000 |
| 8/14/2009 | 1451 | $50,000 |
| 9/4/2009 | 1452 | $50,000 |
| 10/14/2009 | 1454 | $50,000 |
| 11/6/2009 | 1538 | $50,000 |
| 11/27/2009 | 1539 | $50,000 |
| 12/18/2009 | 1540 | $50,000 |
| 1/8/2010 | 1673 | $50,000 |
| 1/22/2010 | 1674 | $50,000 |
| 3/5/2010 | 1752 | $50,000 |
| 3/26/2010 | 1822 | $50,000 |
| 4/15/2010 | 1823 | $50,000 |
| 5/7/2010 | 1824 | $50,000 |
| Not Available | Not Available | $50,000 |

78.    In reliance upon Schmidt's delivery of the post-dated VFD Checks and the promise of payment and representation of the solvency and viability of Schmidt represented thereby, VFD sold and delivered additional Stones to Schmidt as described in the following paragraphs.

79.    Pursuant to Invoice No. D-89, VFD sold and delivered to Schmidt Stones having an invoiced price of $93,485, which amount remains outstanding and due. Schmidt accepted and did not refuse delivery of said Stones under the terms of said invoice.

#1582531 v2
099998-00004

80.    Pursuant to Invoice No. D-90, VFD sold and delivered to Schmidt Stones having an invoiced price of $85,050, which amount remains outstanding and due. Schmidt accepted and did not refuse delivery of said Stones under the terms of said invoice.

81.    Pursuant to Invoice No. D-91, VFD sold and delivered to Schmidt Stones having an invoiced price of $82,320, which amount remains outstanding and due. Schmidt accepted and did not refuse delivery of said Stones under the terms of said invoice.

82.    Pursuant to Invoice No. D-92, VFD sold and delivered to Schmidt Stones having an invoiced price of $17,200, which amount remains outstanding and due. Schmidt accepted and did not refuse delivery of said Stones under the terms of said invoice.

83.    Pursuant to Invoice No. D-93, VFD sold and delivered to Schmidt Stones having an invoiced price of $73,600, which amount remains outstanding and due. Schmidt accepted and did not refuse delivery of said Stones under the terms of said invoice.

84.    Pursuant to Invoice No. D-94, VFD sold and delivered to Schmidt Stones having an invoiced price of $157,735, which amount remains outstanding and due. Schmidt accepted and did not refuse delivery of said Stones under the terms of said invoice.

85.    Pursuant to Invoice No. D-95, VFD sold and delivered to Schmidt Stones having an invoiced price of $85,140, which amount remains outstanding and due.

16

Schmidt accepted and did not refuse delivery of said Stones under the terms of said invoice.

86.     Pursuant to Invoice No. D-96, VFD sold and delivered to Schmidt Stones having an invoiced price of $100,000, which amount remains outstanding and due. Schmidt accepted and did not refuse delivery of said Stones under the terms of said invoice.

87.     All of the invoices referenced in this Eighteenth Count are referred to collectively as the "VFD Invoices."  The VFD Invoices form a series of contracts between VFD and Schmidt requiring Schmidt's payment of the invoiced amounts. Schmidt has made no payments of any amounts due under the VFD Invoices.

88.     VFD has fully performed its obligations under the VFD Invoices.

89.     Schmidt has failed and refused to remit payment of the $1,594,030 due pursuant to the terms of the VFD Invoices.

90.     Schmidt's failure to pay to VFD the unpaid amounts due under the VFD Invoices constitute breaches of the contracts created by the VFD Invoices.

91.     As a result of Schmidt's breach of its contractual obligations, VFD has sustained damages in the amount of $1,594,030 plus interest, expenses and attorneys' fees under the VFD Invoices.

## SCHMIDT'S AND THE WEINTRAUBS' TRANSACTIONS
## WITH NON-PARTIES - THE OTHER MERCHANTS

### FRIMAN

92.     Friman & Stein, Inc. ("Friman") is a New York corporation maintaining a principal place of business located at 589 Fifth Avenue, Suite 709, New York, New York 10017.

17

93.     Pursuant to various invoices all dated April 8, 2010, Friman sold to Schmidt on memorandum: (1) a 5.61 carat diamond ring delivered to Schmidt on September 8, 2008, and having a value of $16,500; (2) a ring, delivered to Schmidt on April 14, 2009, and having a value of $16,500; (3) a diamond bracelet delivered to Schmidt on November 25, 2008, and having a value of $16,500; (4) a 1.63 carat diamond, delivered to Schmidt on March 18, 2009 and having a value of $9,291, (5) a 1.11 carat diamond, delivered to Schmidt on March 23, 2009 and having a value of $4,895; (6) a 1.5 carat diamond, delivered to Schmidt on January 28, 2010 and having a value of $7,950; (7) a 2.01 carat diamond, delivered to Schmidt on October 5, 2009 and having a value of $23,517; (8) a 3.13 carat diamond, delivered to Schmidt on December 2, 2008 and having a value of $35,995; and (9) a 2.14 carat diamond, delivered to Schmidt on October 27, 2008 and having a value of $14,980.  Schmidt accepted and did not refuse delivery of said diamonds and items, and therefore became contractually obligated to pay to Friman the total amount of $146,128, according to the terms of the foregoing invoices.

94.     Pursuant to various invoices all dated November 3, 2008, (these invoices and the invoices referenced in the prior paragraph being referred to herein as the "Friman Invoices"), Friman sold to Schmidt on memorandum: (1) a 1.58 carat diamond, delivered to Schmidt on October 16, 2008 and having a value of $9,250; (2) a 1.07 carat diamond, delivered to Schmidt on October 28, 2008 and having a value of $1,712; and (3) a 2.01 carat diamond ring, delivered to Schmidt on September 5, 2008 and having a value of $18,000.  Schmidt accepted and did not refuse delivery of said diamonds and items under the terms of said invoice, and

#1582531 v2
099998-00004

therefore became contractually obligated to pay to Friman the total amount of $28,962, according to the invoice's terms dated November 3, 2008.

95.    The total amount due from Schmidt to Friman pursuant to the Friman Invoices is $175,090.

96.    Friman has fully performed its obligations under the Friman Invoices.

97.    Schmidt has failed and refused to remit payment of the $175,090 due under the Friman Invoices, which form contracts between Friman and Schmidt requiring Schmidt's payment of the invoiced amounts.

98.    Schmidt's failure to pay to Friman the invoiced amounts constitutes a breach of the contracts created by the Friman Invoices.

**GREENWOOD**

99.    A.F. Greenwood Co. Inc. ("Greenwood") is a New York corporation maintaining a principal place of business located at 10 West 47th Street, Suite 202, New York, New York 10036.

100.    Pursuant to an invoice dated February 25, 2010, Greenwood sold and delivered to Schmidt a jewelry item valued at $1,463 (the "Greenwood Invoice"). Schmidt accepted and did not refuse delivery of said item under the terms of the Greenwood Invoice, and therefore became contractually obligated to pay to Greenwood the invoice price of $1,463 according to the invoice's terms, which indicate that payment was due 30 days from the invoice date, or on March 27, 2010.

101.    Greenwood has fully performed its obligations under the Greenwood Invoices.

#1582531 v2
099998-00004

102.   Schmidt has failed and refused to remit payment of the $1,463 due under the Greenwood Invoice, which forms a contract between Greenwood and Schmidt requiring Schmidt's payment of the invoiced amounts.

103.   Schmidt's failure to pay to Greenwood the invoiced amount constitutes a breach of the contract created by the Greenwood Invoice.

**SCIOLI**

104.   D. Scioli Inc. ("Scioli") is a New York corporation maintaining a principal place of business located at 16 Sturgis Road, Bronxville, New York 10708.

105.   Pursuant to an invoice dated August 26, 2009, Scioli sold and delivered to Schmidt a 4.04 carat diamond with an invoiced value of $96,354.  Schmidt accepted and did not refuse delivery of said diamond under the terms of said invoice, and therefore became contractually obligated to pay to Scioli the invoice price of $96,354 according to the invoice's terms, which indicate that payment was due 30 days from the invoice date, or on September 25, 2009.

106.   Pursuant to an invoice dated August 31, 2009, Scioli sold and delivered to Schmidt a 4.03 carat diamond with an invoiced value of $116,970.  Schmidt accepted and did not refuse delivery of said diamond under the terms of said invoice, and therefore became contractually obligated to pay to Scioli the invoice price of $116,970 according to the invoice's terms, which indicate that payment was due 30 days from the invoice date, or on September 30, 2009.

107.   Pursuant to a memorandum dated September 15, 2009 and an invoice dated September 21, 2009, Scioli sold and delivered to Schmidt two diamonds having a total weight of 6.02 carats and an invoiced value of $149,838.  Schmidt accepted

#1582531 v2
099998-00004

and did not refuse delivery of said diamonds under the terms of said memorandum and invoice, and therefore became contractually obligated to pay to Scioli the invoice price of $149,838 according to the invoice's terms, which indicate that payment was due 30 days from the invoice date, or on October 21, 2009.

108.   Pursuant to a memorandum dated September 22, 2009 and an invoice dated September 29, 2009, (this memorandum and invoice and the memorandum and invoice referenced in the prior three paragraphs being referred to herein as, respectively, the "Scioli Memoranda" and the "Scioli Invoice") Scioli sold and delivered to Schmidt two diamonds, having a total weight of 6.18 carats and an invoiced value of $137,969.  Schmidt accepted and did not refuse delivery of said diamonds under the terms of said memorandum and invoice, and therefore became contractually obligated to pay to Scioli the invoice price of $137,969 according to the invoice's terms, which indicate that payment was due 30 days from the invoice date, or on October 29, 2009.

109.   Scioli has fully performed its obligations under the Scioli Invoices and Scioli Memoranda.

110.   After taking into account certain payments made by Schmidt, the sum of $326,131 remains due from Schmidt to Scioli.

111.   Scioli demanded payment from Schmidt of the full $326,131 outstanding.

112.   On December 10, 2009, Schmidt issued to Scioli a bad check in the amount of $150,000.  Immediately after Schmidt presented the check, he notified Scioli that the funds were not available and that a "stop payment" notice had been placed on the check.

#1582531 v2
099998-00004

113.    To date, Schmidt has failed and refused to remit further payment of the

$326,131 called for under the Scioli Invoices, which form a contract between Scioli

and Schmidt requiring Schmidt's payment of the invoiced amounts.

114.    Schmidt's failure to pay to Scioli the invoiced amounts constitutes a

breach of the contracts created by the Scioli Invoices and Scioli Memoranda.

**BIRNBACH**

115.    J. Birnbach ("Birnbach") is a New York sole proprietorship maintaining a

principal place of business located at 576 Fifth Avenue, Suite 501, New York, New

York 10036.

116.    Pursuant to a memorandum dated January 20, 2009, ("Birnbach

Memoranda") Birnbach delivered to Schmidt (1) a 4.01 carat diamond having an value

of $92,230; (2) a jewelry item having an value of $4,690; (3) a 4.54 carat diamond

having a value of $87,799.06; (4) a ring having a value of $6,750; (5) a 4.04 carat

diamond having a value of $92,213; (6) a ring having a value of $4,625, (7) a 4.03

carat diamond having a value of $64,741.95; (8) a 4.01 carat diamond bearing GIA

No. 15619108 and having a value of $72,180; (9) a 4.01 carat diamond bearing GIA

No. 14307395 and having a value of $110,098.56; and (10) a ring having a value of

$2,565.  Schmidt accepted and did not refuse delivery of said diamonds and items

under the terms of said memorandum, and therefore became contractually obligated

to return or pay for the diamonds and items valued at $537,892.57 according to the

memorandum's terms.

117.    On January 27, 2009, Birnbach invoiced Schmidt ("Birnbach Invoice") for

the following items referenced above: the 4.01 carat diamond having a value of

22

$92,230; the 4.01 carat diamond having a value of $72,180; and the 4.01 carat diamond having a value of $110,098.56, for a total invoice amount of $274,508.56. Payment of said amount was and remains due according to the Birnbach Invoice's terms, which indicate that payment was due net 45, 60 days from the invoice date, or on March 13, 2009. Schmidt returned the balance of the items identified in the Birnbach Memorandum to Birnbach.

118.    Birnbach has fully performed its obligations under the aforesaid Birnbach Memorandum and Birnbach Invoice.

119.    Schmidt has failed and refused to remit payment of $274,508.56, or return the aforesaid items as called for under the Birnbach Memorandum and Birnbach Invoice, which form a contract between Birnbach and Schmidt requiring Birnbach's payment of the value of said items.

120.    Schmidt's failure to either return or pay to Birnbach the value of the aforesaid items constitutes a breach of the contract created by the Birnbach Invoice and Birnbach Memorandum.

**GOLDBERG**

121.    William Goldberg Diamond Corporation ("Goldberg") is a New York corporation maintaining a principal place of business located at 589 Fifth Avenue, New York, New York 10017.

122.    Pursuant to a memorandum dated April 23, 2008, Goldberg sold to Schmidt a 11.16 carat diamond ring bearing GIA No. 14868399 and having a value of $350,000. Goldberg issued an invoice ("Goldberg Invoice") to Schmidt dated April 23,

#1582531 v2
099998-00004

2008 in the amount of $330,000 (reflecting a $20,000 payment made by Schmidt), which was due on June 22, 2008.

123.    On March 26, 2009, Schmidt sent Goldberg a check in the amount of $75,000 by U.S. Mail as a payment against the Goldberg Invoice, with a note stating, "THE FUND TRANSFER HASN'T ARRIVED YET, PLEASE HOLD ONTO THE $75,000.00 CHECK. I WILL LET YOU KNOW AS SOON AS YOU CAN DEPOSIT IT." Schmidt never advised Goldberg that funds were available to deposit the check, and the check was never deposited.  Upon information and belief, at the time that Schmidt delivered said check, Schmidt, D. Weintraub and R. Weintraub had the present intent to never fund said check, and intended the delivery of said check to hinder, delay and defraud Goldberg and its efforts to collect amounts due.

124.    Schmidt made the following payments totaling $260,000 decreasing the amount due under the Goldberg Invoice to $70,000: $100,000 on October 27, 2008; $10,000 on January 22, 2009; $20,000 on March 27, 2009; $40,000 on April 8, 2009; $30,000 on June 19, 2009, $30,000 on July 2, 2009; and $30,000 on November 4, 2009.

125.    Goldberg has fully performed its obligations under the Goldberg Invoice.

126.    Schmidt has failed and refused to remit payment of the $70,000 remaining due under the Goldberg Invoice, which forms a contract between Goldberg and Schmidt requiring Schmidt's payment of the invoiced amount.

127.    Schmidt's failure to pay to Goldberg the $70,000 remaining due under the Goldberg Invoice constitutes a breach of the contract created by the Goldberg Invoice.

24

**KOTHARI**

128.   Kothari & Co. ("Kothari") is a California corporation maintaining a principal place of business located at 550 S. Hill St., Suite 1220, Los Angeles, California 90013.

129.   Pursuant to a memorandum dated October 26, 2009 ("Kothari Memorandum") and an invoice dated November 18, 2009 ("Kothari Invoice"), Kothari delivered to Schmidt a 5.01 carat diamond bearing GIA No. 16894308 valued at $96,442.50.  Schmidt accepted and did not refuse delivery of said diamond, and therefore became contractually obligated to pay to Kothari the invoice price of $96,442.50 according to the invoice's terms, which indicate that payment was due net 30 days from the invoice date, or on December 18, 2009.

130.   Kothari has fully performed its obligations under the Kothari Invoice and Kothari Memorandum.

131.   Schmidt has failed and refused to remit payment of the $96,442.50 due under the Kothari Invoice, which form a contract between Kothari and Schmidt requiring Schmidt's payment of the invoiced amounts.

132.   Schmidt's failure to pay to Kothari the invoiced amounts on December 18, 2009 constitutes a breach of the contract created by the Kothari Invoice.

**PROMPT**

133.   Prompt Gem Importers, Inc. ("Prompt") is a New York corporation maintaining a principal place of business located at 608 Fifth Avenue, New York, New York 10020.

#1582531 v2
099998-00004

134.   Pursuant to a memorandum dated on or about June 3, 2009, Prompt delivered to Schmidt a 4.23 carat diamond having a value of $129,163.05.  Schmidt accepted and did not refuse delivery of said diamond under the terms of said memorandum, and therefore became contractually obligated to pay for or return the diamond to Prompt within thirty days, or before July 3, 2009.

135.   Pursuant to a memorandum dated June 10, 2009 (this memorandum together with the memorandum referenced in the previous paragraph referred to herein as the "Prompt Memoranda"), Prompt delivered to Schmidt (1) a 4.06 carat diamond having a value of $39,828.60 and (2) a 4.00 carat diamond having a value of $46,440.00.  Schmidt accepted and did not refuse delivery of said diamonds under the terms of said memorandum, and therefore became contractually obligated to pay for or return the diamond to Prompt within one week, or before June 17, 2009.

136.   As such, the total value of diamonds Schmidt had under the Prompt Memoranda as of June 10, 2009 was $215,431.65.

137.   Schmidt made the three payments for a total of $112,000, decreasing the balance owed to Prompt to $103,431.65.

138.   Prompt has fully performed its obligations under the Prompt Memoranda.

139.   Schmidt has failed and refused to remit payment of the $103,431.65 remaining due under the Prompt Memoranda, which form a contract between Prompt and Schmidt requiring Schmidt's payment of the outstanding amount.

140.   Schmidt's failure to pay to Prompt the outstanding amount constitutes a breach of the contracts created by the Prompt Memoranda.

**MENKIN**

26

141.   Michael Menkin, Inc. ("Menkin") is a New York corporation maintaining a principal place of business located at 579 Fifth Avenue, New York, New York 10017.

142.   Pursuant to a Memorandum dated July 28, 2009 ("Menkin Memorandum"), Menkin delivered to Schmidt a 5.02 carat diamond bearing GIA No. 1102797174 and a 5.08 carat diamond bearing GIA No. 5101797175.  Schmidt accepted and did not refuse delivery of said diamonds under the terms of the Menkin Memorandum, and therefore became contractually obligated to pay for or return to Menkin the diamonds delivered under the Menkin Memorandum.

143.   Pursuant to an invoice dated August 3, 2009 ("Menkin Invoice") Menkin sold the diamonds identified in the Menkin Memorandum to Schmidt for an invoiced value of $78,105 and $77,182, respectively.  Schmidt retained and did not return said diamonds under the terms of the Menkin Invoice, and therefore became contractually obligated to pay to Menkin the invoice price of $155,287.50 according to the invoice's terms which required payment within 24 hours.

144.   On November 3, 2009, Schmidt remitted a check to Menkin in the amount of $100,000, which reduced the amount due to Menkin under the Menkin Invoice to $55,287.50.

145.   Menkin has fully performed its obligations under the Menkin Memorandum and the Menkin Invoices.

146.   The Menkin Invoice and Menkin Memorandum form a contract between Menkin and Schmidt requiring Schmidt's payment of the invoiced amount.

147.   Schmidt's failure and refusal to remit payment of $55,287.50 constitutes a breach of the contracts created by the Menkin Invoice and Menkin Memorandum.

#1582531 v2
099998-00004

**CORA**

148.    Cora International, LLC ("Cora"), is a New York limited liability company maintaining a principal place of business located at 590 Fifth Avenue, New York, New York 10036.

149.    Pursuant to an Invoice dated July 7, 2009 (the "Cora Invoice"), Cora sold and delivered to Schmidt a 7.98 carat diamond bearing GIA No. 2105439050 and having an invoiced value of $337,250.  Schmidt accepted and did not refuse delivery of said diamond under the terms of said invoice, and therefore became contractually obligated to pay to Cora the invoice price of $337,250 according to the invoice's terms, which indicate that payment was due 45 days from the invoice date, or on August 21, 2009.

150.    Cora has fully performed its obligations under the aforesaid invoices.

151.    Schmidt has failed and refused to remit payment of the $337,250 called for under the Cora Invoice, which forms a contract between Cora and Schmidt requiring Schmidt's payment of the invoiced amount.

152.    Schmidt's failure to pay to Cora the invoiced amount on or before, August 21, 2009 constitutes a breach of the contract created by the Cora Invoice.

**MAIDI**

153.    Maidi Corp. ("Maidi") is a New York corporation maintaining a principal place of business located at 608 Fifth Avenue, Suite 501, New York, New York 10020.

154.    Pursuant to an invoice dated March 22, 2010 ("Maidi Invoice"), Maidi sold and delivered to Schmidt a pair of diamond earrings having an invoiced value of $105,000.  Schmidt accepted and did not refuse delivery of said jewelry item under the

#1582531 v2
099998-00004

terms of the Maidi Invoice, and therefore became contractually obligated to pay to Maidi the invoice price of $105,000 according to the invoice's terms, which indicate that payment was due net 30 days from the invoice date, or on April 21, 2010.

155.    Maidi has fully performed its obligations under the Maidi Invoice.

156.    Schmidt has failed and refused to remit payment of the $105,000 due under the Maidi Invoice, which forms a contract between Maidi and Schmidt requiring Schmidt's payment of the invoiced amount.

157.    Schmidt's failure to pay to Maidi the invoiced amounts constitutes a breach of the contract created by the Maidi Invoice.

**NELI**

158.    Neli Gems Corp. ("Neli") is a New York corporation maintaining a principal place of business located at 589 Fifth Avenue, New York, New York 10017.

159.    Pursuant to a verbal agreement between Schmidt and Neli that took place in July 2008 ("Neli Agreement"), Schmidt sold a 6.87 carat emerald ring that was jointly owned by Schmidt and Neli to a customer for $52,000. Schmidt retained the entire proceeds of that sale.

160.    Neli subsequently sent Schmidt an invoice for one-half of the $52,000 sales price, or $26,000 ("Neli Invoice").

161.    Pursuant to the Neli Agreement and Neli Invoice, Schmidt is contractually obligated to pay $26,000 to Neli.

162.    Neli has fully performed its obligations under the Neli Agreement and Neli Invoice.

#1582531 v2
099998-00004

163.   Schmidt has failed and refused to remit payment of the $26,000 due under the Neli Agreement and Neli Invoice, which form a contract between Neli and Schmidt requiring Schmidt's payment of the invoiced amount.

164.   Schmidt's failure to pay to Neli the invoiced amount constitutes a breach of the contract created by the Neli Agreement and Neli Invoice.

<div align="center">

**EIGHTH CAUSE OF ACTION**
**(Common Law Fraud)**

</div>

165.   Plaintiffs re-allege and incorporate by reference the foregoing paragraphs of the Complaint as if set forth fully herein.

166.   To induce the Plaintiffs to sell and deliver Stones to Schmidt, each of the Defendants and D. Weintraub made various and myriad representations to each of the Plaintiffs that Schmidt would timely pay for and was timely paying for the Stones pursuant to the various memoranda, invoices and other agreements referenced above.

167.   Each of the Defendants and D. Weintraub intended that the Plaintiffs rely upon said representations in causing the Plaintiffs to sell and deliver Stones to Schmidt as aforesaid.

168.   In making said representations to the Plaintiffs, each of the Defendants and D. Weintraub knew or should have known that the Plaintiffs would reasonably rely upon the veracity of the representations in causing the Plaintiffs to sell and deliver Stones to Schmidt as aforesaid.

169.   The Plaintiffs reasonably relied upon said representations in selling and delivering the Stones to Schmidt as aforesaid.

#1582531 v2
099998-00004

170.   After the various dates that the Plaintiffs sold the Stones to Schmidt, the Plaintiffs discovered that the Defendants' and D. Weintraub's material representations that Schmidt would timely pay for the Stones were false when made, as Schmidt defaulted in payment, and D. Weintraub and R. Weintraub engaged in an elaborate scheme of making false promises of payment, delaying tactics, and efforts to hinder, delay and defraud the Plaintiffs as further set forth below.  At the time that the Defendants and D. Weintraub made representations that Schmidt would timely pay for the Stones, the Defendants and D. Weintraub knew or should have known that such representations were materially false.  As such, the Defendants, acting in concert with D. Weintraub, materially misrepresented their intentions regarding performance under the various invoices, memoranda and other agreements set forth above.

171.   Accordingly, the Plaintiffs have been defrauded by the misrepresentations and concealment of material facts by the Defendants and D. Weintraub.

172.   As a result of the Plaintiffs' reasonable reliance upon the Defendants' and D. Weintraub's material misrepresentations and fraud as aforesaid, the Plaintiffs has been damaged in the amounts set forth in the unpaid invoices, memoranda and other agreements identified above.

### NINTH CAUSE OF ACTION
**(RICO - 18 U.S.C. § 1962(c) on Behalf of All Plaintiffs)**

173.   Plaintiffs re-allege and incorporate by reference the foregoing paragraphs of the Complaint as if set forth fully herein.

#1582531 v2
099998-00004

## CONDUCT OF THE ENTERPRISE

174.   As set forth below, the Defendants, acting in concert with D. Weintraub, are guilty of engaging in a RICO enterprise in violation of under 18 U.S.C. § 1962(c), and that enterprise is referred to as the "RICO Enterprise".

### A.   The RICO Enterprise

175.   At all times relevant hereto, D. Weintraub and R. Weintraub (together, the "Weintraubs"), individually, were "persons" within the meaning of 18 U.S.C. §§ 1961(3) and insiders, directors, officers, principals and/or shareholders of Schmidt.

176.   At all relevant times hereto, the Weintraubs were members of and/or were associated-in-fact with an "enterprise" consisting of both of them engaged in or the activities of which affected interstate or foreign commerce within the meaning of 18 U.S.C. § 1961(4).

177.   The RICO Enterprise included both of the Weintraubs who were associated-in-fact in the creation, acquisition and/or operation of Schmidt.  The members of the RICO Enterprise included each of the Weintraubs.

178.   The RICO Enterprise had an ascertainable structure, and a continuity of structure and personnel.  In particular, the RICO Enterprise was formed by both of the Weintraubs for the purpose of influencing, operating and dominating Schmidt to the end of defrauding each of the Plaintiffs into delivering to Schmidt the Stones described above at times when the Weintraubs specifically intended not to pay for same, but rather to convert and sell said Stones and retain the proceeds of such sales for the benefit of the Weintraubs individually.

179.   In fact, Plaintiffs have learned that the Weintraubs sold many if not all of the Stones described above at deeply discounted prices significantly below the market

#1582531 v2
099998-00004

value of the Stones as invoiced by the Plaintiffs.  Upon information and belief, such discounts generally ranged between 35% and 50%.

180.   The Weintraubs' obvious intent was to defraud the Plaintiffs into delivering Stones so that the Weintraubs could liquidate same in fire sales to raise cash to pay creditors other than the Plaintiffs, to finance the Weintraubs' lavish lifestyles, and to otherwise hinder, defraud and delay the Plaintiffs in their efforts to collect amounts due to them from Schmidt as aforesaid.  Without limitation, as evidenced by the myriad false promises of payment made by the Weintraubs to various representatives of the Plaintiffs as detailed below, the Weintraubs induced the Plaintiffs to forebear from exercising legal remedies and/or to deliver Stones to Schmidt for extended periods in order to permit the Weintraubs to continue the RICO enterprise.

181.   As previously alleged, the Weintraubs were insiders, directors, officers, principals, shareholders and/or employees of Schmidt.  D. Weintraub held a direct controlling interest in and was the President and a Director of Schmidt.  Upon information and belief, R. Weintraub held a legal or equitable ownership interest in Schmidt and served as the Executive Vice President and a Director of Schmidt.

182.   The RICO Enterprise had an existence separate and apart from the particular instances of racketeering activity described below.  In particular, Schmidt existed as a corporate entity and the Weintraubs controlled it in their roles as owners, directors, officers and/or employees of Schmidt.

## THE PATTERN OF RACKETEERING ACTIVITY

183.   Beginning no later than 2008 and continuing until early 2010, the Weintraubs were members of and were employed by or associated-in-fact with the

#1582531 v2
099998-00004

RICO Enterprise, and did conduct or participate, directly or indirectly, in the conduct of the affairs of the RICO Enterprise through a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(1).

184.    The Weintraubs were able to commit and aid and abet the racketeering activity described below by virtue of their control over the affairs of the RICO Enterprise.  These offenses were committed as part of racketeering activity in that they had the same or similar purposes, results, participants, victims and/or methods of commission, and include two or more related individual offenses which were separate in time and committed with the express intention and common design and purpose of (i) fraudulently obtaining the Stones described above from the Plaintiffs at times when the Weintraubs specifically intended not to pay for same, but rather to convert and sell said property and retain the proceeds of such sales for the benefit of the Weintraubs individually; (ii) obtaining and converting the Stones by false representations that said property would be held in trust, on consignment, or paid for, and misappropriating substantial assets of Plaintiffs at a time Schmidt was not able to meet its obligations to its creditors, including Plaintiffs; (iii) repeatedly delivering bad checks, false promises of payment by mail, email, wire, fax, and verbally, and other misrepresentations regarding payment; (iv) signing and delivering promissory notes to delay creditors; (v) and committing other acts of mail and wire fraud with an actual intent to hinder, delay and defraud Plaintiffs and their efforts to collect amounts due to them.  Without limitation, the Weintraubs sold the Stones that they fraudulently obtained and converted from the Plaintiffs, at significant discounts, and retained and converted the proceeds of said sales to finance their lifestyles and pay other obligations, while at all

#1582531 v2
099998-00004

times intending to not pay Schmidt's obligations to the Plaintiffs. This series of related offenses extended over a substantial period of time and posed a threat of continuing activity.

185.   The above-alleged pattern of racketeering offenses included, among others, the separate acts and episodes of racketeering activity set forth below.

186.   The acts of mail fraud and wire fraud detailed elsewhere in the Complaint occurred in a continuous pattern, beginning no later than 2008 and continuing until early 2010, when (i) the Plaintiffs began communicating with one another and (ii) the Weintraubs' fraud and pattern and practice of racketeering activity was discovered.

## MAIL FRAUD

187.   As described above and as set forth in greater detail below, the Weintraubs, through their corporate instrumentality Schmidt, abused their long-standing business relationships with each of the Plaintiffs to (i) obtain deliveries of Stones at times when the Weintraubs represented that they would pay for the Stones but, in fact, had no intention of paying for same and when Schmidt was incapable of paying its debts as they came due; (ii) misrepresent to the Plaintiffs that payments for the Stones were forthcoming from Schmidt's sale of the Stones to customers and other sources when, in fact, Schmidt had no ability to make such payments; (iii) unlawfully take possession of and convert the Stones and sell the same to third parties at significant discounts from the fair market value of said property; (iv) unlawfully convert the proceeds of said discounted sales to the Weintraubs' own use and benefit; and (v) repeatedly misrepresent to each of the Plaintiffs the nature of the transactions in issue to conceal the fraudulent racketeering nature of the RICO

#1582531 v2
099998-00004

Enterprise.  These acts formed a pattern of fraud on the Plaintiffs that continued from at least 2008 until 2010 in which the Weintraubs, their co-conspirators and agents, unlawfully, willfully and knowingly devised and intended to devise a scheme and artifice for inducing the Plaintiffs to deliver Stones to Schmidt.  The Weintraubs engaged in this fraudulent pattern even though the Weintraubs knew (i) that Schmidt was failing to and incapable of paying its debts, (ii) that the representations and undertakings that they were making were false and could not be complied with, and (iii) that the Weintraubs had no intention of paying to the Plaintiffs the value of the Stones that the Plaintiffs sold and delivered to Schmidt.  Thus, the Weintraubs obtained property from the Plaintiffs and from Schmidt which they diverted to themselves by means of false and fraudulent pretenses, representations and promises, and through the concealment of material facts.

188.    The Weintraubs and their co-conspirators and agents unlawfully, willfully and knowingly, and for purposes of executing and attempting to execute, the scheme and artifice to defraud, and for obtaining money and property from the Plaintiffs, did place and cause to be placed in post offices and authorized depositories for mail certain mail matter to be sent or delivered by the U.S. Postal Service and/or did deposit or cause to be deposited certain mail matter to be sent or delivered by any private or commercial interstate/international carrier, and did cause to be delivered by mail and/or private or commercial interstate/international carrier, according to the directions thereof, certain mail matter, in violation of 18 U.S.C. § 1341, including as examples, and without limitation, the following (collectively, the "Mail Fraud Communications").

#1582531 v2
099998-00004

189. Schmidt and the Weintraubs transmitted the VFD Checks to VFD and received the VFD Invoices from VFD by U.S. Mail and/or comparable commercial common couriers. Accordingly, Schmidt and the Weintraubs utilized mail services to defraud VFD and to induce VFD to continue to deliver Stones to Schmidt by representing, in delivering the invalid VFD Checks to VFD, that Schmidt was solvent, viable and answerable for its debts.

190. Each of the aforesaid Mail Fraud Communications, as well as others, was in furtherance of the scheme to defraud alleged in this Complaint. The Weintraubs knew of and/or authorized such mailings and knew that such mailings were in furtherance of and for the purpose of executing the scheme or were incidental to an essential part of the scheme. Each of these mailings furthered the scheme to defraud which was intended to and did, in fact, injure the Plaintiffs in their business and property.

## WIRE FRAUD

191. From at least 2008 until early 2010, the Weintraubs and their co-conspirators and agents unlawfully, willfully and knowingly, and for purposes of further executing and attempting to execute, the scheme and artifice to defraud, and for obtaining money and property from the Plaintiffs and the non-party Other Merchants, did use interstate wire services to place interstate and intrastate telephone calls, and send interstate and intrastate emails and telefaxes in violation of 18 U.S.C. § 1343, including as examples, and without limitation, the following (collectively, the "Wire Fraud Communications"):

#1582531 v2
099998-00004

192.   Communications with Tiffany.

    a.   By accepting delivery of Stones pursuant to the Tiffany Invoices as detailed in the First Cause of Action above, the Weintraubs falsely represented to Tiffany that they intended, through Schmidt, to pay all amounts due under the Tiffany Invoices when due.

    b.   On October 24, 2009, R. Weintraub emailed Deborah Kaufman of Tiffany ("Kaufman") seeking to pick up an 8 carat and a 6 carat diamond on the following Monday.

    c.   On November 5, 2009, R. Weintraub emailed Kaufman directing her to provide a bill for the 8 carat diamond and explaining that the 6 carat diamond "hasn't come out of GIA yet[.]"

    d.   On November 5, 2009, Kaufman emailed R. Weintraub requesting bank information and corporate references prior to completing the sale for either the 8 carat or the 6 carat diamonds.

    e.   On November 5, 2009, R. Weintraub and Kaufman had a telephone conversation whereby, R. Weintraub stated that he would have an answer on the 6 carat diamond the following day.  Additionally, R. Weintraub agreed to invoice terms during the conversation and explained that he would not have an issue paying for both stones within 45 days.

    f.   On November 6, 2009, R. Weintraub emailed Andrew Hart ("Hart") of Tiffany stating that, per his conversation with Kaufman, he could be billed for the 8 carat and the 6 carat diamonds.

    g.   On February 5, 2010, after receiving a notice of collection letter, R. Weintraub, who was in California at the time, emailed the Manager of Collections & Fraud Prevention at Tiffany, explaining that payment was delayed because he and his father were in Los Angeles due to his sister's surgery after being diagnosed with cancer.

193.   Communications with Roubin.

    a.   By accepting delivery of Stones pursuant to the Bares and Newman Invoices as detailed in the Fifth Cause of Action above, the Weintraubs falsely represented to Roubin that they intended, through Schmidt, to pay all amounts due under the Bares and Newman Invoices when due.

    b.   During February 2010, D. Weintraub, while in California, contacted Roubin by telephone and requested that Roubin act as Schmidt's

#1582531 v2
099998-00004

agent and/or broker for the purchase of the Bares Earrings and the Newman Earrings described in the Sixth Cause of Action, above.

c.    Roubin responded that he was in the colored stone business and not the diamond business, and asked why D. Weintraub was asking Roubin to get involved in a diamond trade.

d.    D. Weintraub stated that, if the diamond market knew that Schmidt was looking for the types of items represented by the Bares Earrings and the Newman Earrings, the market would "go crazy" and raise prices dramatically.

e.    At the time, Roubin, who was an unemployed single father, needed work and agreed to act as Schmidt's agent/broker for the transaction.  Roubin remains indebted to Bares in the amount of $56,745 and to Newman in the amount of $76,500, representing Roubin's purchase price from those sellers.

f.    D. Weintraub knew that Roubin did not own the Bares Earrings and the Newman Earrings and upon information and belief, D. Weintraub never intended to pay for them.

g.    Upon information and belief, as of the February 2010 date of the transactions between Roubin and Schmidt, some of which transpired while D. Weintraub was in California, the Weintraubs and Schmidt had ruined their reputations with all other merchants in the diamond business.

h.    Desperate for new sources of Stones, D. Weintraub preyed upon the unsuspecting Roubin, who had known D. Weintraub for many years but was unaware of the Weintraub's' fraudulent scheme of buying Stones with no intention of paying for the same.

194.    Communications with Graff - Between approximately June 2010 and November 2010, Henri Barguirdjian, CEO of Graff ("HB" or "Henri"), and D. Weintraub ("Doug") exchanged the following series of text messages regarding Schmidt's payment of amounts due under the Graff Memorandum as described above.  All errors appear *verbatim*:

a.    By accepting delivery of Stones pursuant to the Graff Memorandum as detailed in the Sixth Cause of Action above, the Weintraubs falsely represented to Graff that they intended, through Schmidt, to pay all amounts due under the Graff Memorandum when due.

#1582531 v2
099998-00004

b.    "Hi Doug I can't wait any longer [for payment] what is the status? You told me that your deal would be done yesterday. . .HB"

c.    "Henri, Theyre still in the office.  They were here all day yesterday until 530 PM.  They're still here today and tomorrow.  We're sorting through 300,000 stones together to work out a deal.  As soon as I know the amount, ill let you know.-doug"

d.    "Please call me tomorrow with some kind of news there is nothing else I can do!!"

e.    "Absolutely, as soon as I can."

f.    "I just made a solemn promise to Laurence [Graff, Chairman and CEO of Graff UK, Graff's parent company] on your behalf I pray to god I won't have to go back on my word.  HB"

g.    "hi Doug Any news for me? Henri"

h.    "The goods have been shipped; 2-60 lb boxes.  They're supposed to be delivered to their facility today.  Now they have to open them and cut us a check.  Ill let you know the second I have it."

i.    "Hi Doug My people want to send someone tomorrow to pick up a check.  What time should I tell them? Henri"

j.    "Henri, As I told you yesterday, we are just waiting for the money, and the office is closed tomorrow. Doug"

k.    "Hi Doug What is the status this morning?  Henri"

l.    "Henri, I am waiting as you are, but we are even sending 4 more boxes of goods from that inventory I sent you to make sure there is enough there to cover what's necessary.  I'm not happy about this delay any more than you are."

m.    "Doug I am under extreme pressure and it is getting very uncomfortable."

n.    "Hi Doug I can't wait any longer please help me!! Henri"

o.    "Help will be on the way shortly.  Was working with them all day today."

p.    "Hi Doug You told me that this would be over very shortly . . . We cannot wait anymore Henri"

#1582531 v2
099998-00004

q.      "Henri, As I said yesterday, please just hang in, and this is going to work."

r.      "Ok Doug but how long?"

s.      "Hi Doug I need to know where we are HB"

t.      "Henri, I know you've been trying to get a hold of me. I'm in the middle of something very important; not that our situation isn't important but I must finish up what I'm doing. Ill give you a call when I can. Thanks - Doug"

u.      "Hi Doug Laurence will be coming to NY next week We need to have this resolved before . . . HB"

v.      "Doug we need to talk I am going to loose my job because of you please call me back! Henri"

w.      "I'm in someone's office right now. Don't you think I want to be over this? I'm working on it every day. Its my number one priority. As quickly as I can bring it to a close I will. By the way, the people in Tennessee haven't sent in the $ yet. They're still separating the goods in Bangkok and Tennessee, but I'm after them daily to speed it up."

x.      "Hi Doug Where are we standing?  Henri"

y.      "Henri, The guy just got to NY he was stuck in Europe, and I'm waiting to see him. He says all the goods I shipped have arrived. Doug"

z.      "You told me they were separating the goods two days ago . . . I am in big trouble with this all situation. . . HB"

aa.     "Henry, I'm trying to make them work as fast as possible, and I am continuing to give you an update. I have not stopped working on this. I didn't call you this morning because it is very early and I am already leaving to go to work. Doug"

bb.     "Hi Doug I need help Laurence is all over me!! H"

cc.     "Henri, the guys left last night. Just as I said to you last week, they received all the packages and they need to finish sorting through it before sending me a check. Sorry for the headache. . . ."

dd.     "When do you think you will receive it? H"

#1582531 v2
099998-00004

ee.   "Hi Doug I just received your fax which is very concerning to me this could take months and it is absolutely not acceptable by Graff this is not what you promised me and I vouched for you . . . Please advise HB"

ff.   "I'm calling them beginning of next week to make sure they give me something up front against the merchandise they have to make sure this doesn't take months. This was just to let you know that I'm working on it and haven't stopped. . . ."

gg.   "Hi Doug Where do we stand? Henri"

hh.   "As I told you last week, I spoke with them. They said they were taking care of it this week. I put another call into them today to find out when they're sending it through."

ii.   "I just want you to know that Laurence is in NY and if this is not resolved by the end of the week he will do whatever it takes to get paid what you owe him HB"

jj.   "Just an update: I spoke to the TV people last night and they're in the process of going through all the cartons so they can get them out of their warehouse and send us our money. I guess they finally got sick of looking at 20 boxes of merchandise."

kk.   "Doug this doesn't help you said the same thing two weeks ago. . .We need to close this now!"

ll.   "Doug I need to hear from you I feel and look like a fool in front of all my company as I trusted who I thought was a friend."

mm.   "Henri I am a friend and this is a business situation, not a friendship situation. Unfortunately, I have no control over the funds being transferred in. I'm sitting here with empty drawers as I sent 98% of my inventory to these people. I'm waiting just like you are. We will always be friends."

nn.   "Doug, where are we standing? Henri"

oo.   "Doug I need an answer please!! Henri"

195.   Communications with Heyman.

a.   By accepting delivery of Stones pursuant to the Heyman Invoice as detailed in the Eighth Cause of Action above, the Weintraubs falsely represented to Heyman that they intended, through Schmidt, to pay all amounts due under the Heyman Invoice when due.

#1582531 v2
099998-00004

b.  On March 11, 2010, D. Weintraub emailed Heyman requesting a picture of one of the Stones sold by Heyman to Schmidt as detailed above.

196.  Communications with Fischer.

a.  By accepting delivery of Stones pursuant to the Fischer Invoice as detailed in the Second Cause of Action above, the Weintraubs falsely represented to Fischer that they intended, through Schmidt, to pay all amounts due under the Fischer Invoice when due.

b.  On September 10, 2009, eight days after Fischer's delivery of the $99,360 diamond detailed in the Third Cause of Action, above, R. Weintraub emailed Jeffrey Fischer, the principal of Fischer, seeking a similar, but less expensive diamond.  Fortunately, Fischer had no similar diamond and made no further deliveries to Schmidt.

c.  On November 3, 2009, Jeffrey Fischer had a telephone conversation with R. Weintraub, who promised payment of amounts due "this week."

d.  On November 9, 2009, Jeffrey Fischer had a telephone conversation with R. Weintraub, who apologized for the delay in payment, blaming same on a death in the family.

e.  On November 13, 2009, Schmidt delivered a $25,000 check to Fischer and promised an additional $50,000 the following week.

f.  On December 3, 2009, Jeffrey Fischer had a telephone conversation with D. Weintraub who promised that Schmidt would "have all the money by next Tuesday" as a "100% commitment" and "guarantee by end of week for sure."

g.  On January 12, 2010, D. Weintraub telephonically told Jeffrey Fischer that he was trying to get a mortgage or personal loan to pay Fischer.

h.  Between January 12, and February 25, 2010, D. Weintraub and R. Weintraub left a number of messages with Fischer to the effect that they were working on sources of payment.  As nothing materialized, on February 25, Jeffrey Fischer went to Schmidt's office and asked D. Weintraub and R. Weintraub for goods to hold as collateral.  The Weintraubs said they had nothing, as all of their goods were out with customers.

i.  During that meeting Jeffrey Fischer stated that Fischer's bank was pressuring Fischer regarding Schmidt's repayment.  D. Weintraub

#1582531 v2
099998-00004

> stated that Jeffrey Fischer should give the bank D. Weintraub's "assurances" that the debt would be repaid.

j.    On March 2, 2010, Jeffrey Fischer left a voicemail for D. Weintraub as follows: "You are not returning my calls. Call me next week or you leave me no alternative but to talk to Tiffany about your situation."

k.    In response, D. Weintraub left the following voicemail: "Don't threaten calling Tiffany. We have a special relationship. They are my biggest customer. Everyone knows I cut for them – call you'll never see your money."

l.    On March 5, 2010, D. Weintraub delivered a personal promissory note to Fischer by fax to induce Fischer "to be patient for a few more days," but refused to have R. Weintraub sign the note.

m.    On March 22, 2010, D. Weintraub told Jeffrey Fischer that customers were "coming in tomorrow to buy," implying that funds would then be available to pay Fischer.

n.    On April 26, 2010, Fischer field suit against D. Weintraub on the promissory note, and, on June 3, 2010, the Supreme Court of New York entered judgment against D. Weintraub against Fischer in the amount of approximately $74,000.

197.    Communications with Scioli.

a.    By accepting delivery of Stones pursuant to the Scioli Invoice as detailed in the above, the Weintraubs falsely represented to Scioli that they intended, through Schmidt, to pay all amounts due under the Scioli Invoice when due.

b.    Upon information and belief, during 2009 and 2010, Dennis Scioli, the principal of Scioli, and D. Weintraub exchanged a series of text messages, some of which occurred while D. Weintraub was in California, which included the following:

c.    D. Weintraub stated that he was returning to New York from California to "focus on paying [Scioli] down."

d.    D. Weintraub told Dennis Scioli that Schmidt would provide Stones to Scioli that Scioli could sell to satisfy Schmidt's debt.

e.    D. Weintraub represented to Dennis Scioli that D. Weintraub was obtaining a mortgage loan to satisfy Schmidt's debt.

#1582531 v2
099998-00004

f.     D. Weintraub represented to Dennis Scioli that he as obtaining a personal loan from a friend to satisfy Schmidt's debt.

g.     Neither D. Weintraub nor Schmidt ever obtained these sources of funds to repay Scioli.

198.   Communications with Birnbach.

a.     By accepting delivery of Stones pursuant to the Birnbach Invoices as detailed above, the Weintraubs falsely represented to Birnbach that they intended, through Schmidt, to pay all amounts due under the Birnbach Invoices when due.

b.     On May 19 and May 22, 2009, D. Weintraub sent to Birnbach two faxes claiming that a large transfer of funds was supposed to be received by Schmidt which would allow Schmidt's repayment of the outstanding amounts owed by Schmidt to Birnbach as detailed above.

c.     On May 26, 2009 D. Weintraub sent to Birnbach a fax claiming that the funds described above had not yet been received in Schmidt's account, but that D. Weintraub expected "that this week we will have it all, and I will take care of our account with you."

d.     On June 8, 2009, D. Weintraub sent a fax to Birnbach claiming that Schmidt was unable to pay the amounts due to Birnbach because Schmidt never received payment for Birnbach's Stones that Schmidt sold or other funds that D. Weintraub was expecting.  D. Weintraub claimed to be upset by Schmidt's inability to pay, and represented to Birnbach that Schmidt had only paid suppliers late "a handful of times."  D. Weintraub closed the fax by stating that "[i]f I could take care of this today I surely would."

e.     On July 23, 2009, D. Weintraub sent another fax to Birnbach, stating that he hoped to send another check to Birnbach that week, but funds were never deposited into Schmidt's account, so that payment "should be next week."

f.     On August 12, 2009, D. Weintraub sent a fax to Birnbach apologizing for the non-payment, claiming that "I do expect to finalize our situation in the near future", and claiming that "this is my "Number One Priority[.]"

199.   Communications with Goldberg.

a.     By accepting delivery of Stones pursuant to the Goldberg Invoice as detailed above, the Weintraubs falsely represented to Goldberg

45

that they intended, through Schmidt, to pay all amounts due under the Goldberg Invoice when due.

b.      Between March 2009 and April 2010, Goldberg sent a multitude of faxed requests to Schmidt seeking payment of Schmidt's debt to Goldberg.  A number of those requests and Schmidt's responses are summarized below.

c.      On or about March 26, 2009, D. Weintraub delivered two checks made payable to Goldberg, one in the amount of $20,000 which was negotiated and paid as detailed above, and a second in the amount of $75,000 ("$75,000 Check") with a note asking that Goldberg not deposit same until D. Weintraub approved the deposit.

d.      On April 6, 2009, D. Weintraub sent a fax to Saul Goldberg, principal of Goldberg, stating that "I'm working on putting something together for you this week."

e.      Also on April 6, 2009, Saul Goldberg sent a fax to D. Weintraub asking "[c]an we have a payment tomorrow or Wednesday – the latest?"  D. Weintraub responded by fax "[y]es, Saul, we should have something tomorrow or Wednesday."

f.      On April 24, 2009 Saul Goldberg sent a fax to D. Weintraub asking "[c]an we deposit the check for $75,000?"

g.      On April 27, 2009, D. Weintraub faxed a response that stated "I'm going to try to do it this week, but I'd appreciate your not depositing [the $75,000 Check] until I tell you."

h.      On May 1, 2009, Saul Goldberg sent a fax to D. Weintraub stating that "[w]e need to put in the check."

i.      On May 1, 2009, D. Weintraub responded in a fax "[p]lease bear with us. . . .I will try to make this happen as early as possible in the week.  Please don't deposit the check until you hear from me."

j.      On May 8, 2009, Saul Goldberg sent a fax to D. Weintraub asking "[p]lease confirm that we can deposit the check.  You said this week!"

k.      On May 11, 2009, D. Weintraub responded by fax "[w]e were held up again.  I'm assured that all of our money will be in within 10 days and, in turn, your full bill will be taken care of."

l.      On May 21, 2009, Saul Goldberg faxed a request stating "[p]lease advise if we will have money tomorrow."

#1582531 v2
099998-00004

m.  On May 22, 2009, D. Weintraub sent a fax to Saul Goldberg claiming "[w]e are expecting a very large transfer of funds, but as of right now, it hasn't hit our account.  However, we are expecting it momentarily.  Please be assured that as soon as we receive it, we will forward it to you."

n.  On August 11, 2009, Saul Goldberg sent a fax to D. Weintraub stating "[w]e would like a large check tomorrow.  We really need it."

o.  On August 12, 2009, D. Weintraub responded with a fax claiming that "I do expect to finalize our situation with you in the near future. . . .[Y]ou have my assurance that this is my Number One Priority."

p.  On September 9, 2009, D. Weintraub sent a fax to Saul Goldberg claiming that "[a]gainst my better judgment I had given into the temptation of giving you dated checks, which is something I had never previously done." That statement was false.

q.  On October 5, 2009, R. Weintraub responded to Lili Goldberg's telephone message with a fax that claimed "I know why you are calling. . .I'm on top of it and I will get a check to you as soon as I possibly can."

r.  On February 2, 2010, Saul Goldberg sent a fax to D. Weintraub stating that "[w]e must arrange a payment this week."

s.  On February 9, 2010, D. Weintraub, while in California, responded by fax: "I'm still working on the debt owed and please understand that it is foremost in my mind."

200.  Communications with Cora.

a.  By accepting delivery of Stones pursuant to the Cora Invoice as detailed above, the Weintraubs falsely represented to Cora that they intended, through Schmidt, to pay all amounts due under the Cora Invoice when due.

b.  On September 17, 2009, R. Weintraub left a voicemail message for a representative of Cora, that Schmidt hoped to pay "next week."

c.  On October 29, 2009, D. Weintraub left a voicemail message for a representative of Cora that Schmidt was waiting for funds to clear.

d.  On November 10, 2009, a representative of Cora spoke to R. Weintraub, who stated that Schmidt was "still waiting for money," that funds were coming in, and that Schmidt should make a payment "tomorrow" or November 11, 2009.

#1582531 v2
099998-00004

e.   On November 13, 2009, a representative of Cora spoke with D. Weintraub, who represented that Cora would be paid in full by month end.

f.   On December 9, 2009, a representative of Cora called D. Weintraub who promised that Cora would be paid "this week."

g.   Schmidt delivered a check dated December 22, 2009 in the amount of $100,000 to Cora with a note stating that Cora was not to deposit same until Schmidt called and gave deposit approval.  Schmidt never approved Cora's deposit of the check.

201.   Communications with Maidi.

a.   In March 2010, D. Weintraub telephoned Raphael Maidi, the principal of Maidi, seeking to purchase a pair of diamond earrings. Maidi emailed several pictures of earrings, including a pair with a price of $112,000.

b.   D. Weintraub asked for a discount off the $112,000 price in another telephone call to which Raphael Maidi agreed.  Schmidt purchased the earrings at a discounted price of $105,000 as set forth above under the Maidi Invoice dated March 22, 2010.  Due to the discount, D. Weintraub promised Raphael Maidi that the invoiced price would be paid in 30 days.

c.   By accepting delivery of Stones pursuant to the Maidi Invoice as detailed in the Seventh Cause of Action above, the Weintraubs falsely represented to Maidi that they intended, through Schmidt, to pay all amounts due under the Maidi Invoice when due.

d.   When payment was due, Raphael Maidi spoke with D. Weintraub who claimed to have just returned from California and said he needed a few more days to pay.  After those few days, D. Weintraub claimed that his client who had purchased the earrings was in Africa and that he needed to contact the client to have the funds wire transferred.

e.   On April 27, 2010, D. Weintraub sent a fax to Raphael Maidi claiming that "I am waiting for a large accounts receivable to arrive. I did speak with them [the client] late last night and they are back home.  They told me that they will be sending me a check this week.  Again, my apologies."

f.   On May 6, 2010, D. Weintraub sent a fax to Raphael Maidi claiming that "I don't want you to think I forgot about you. . . . [M]y office is still awaiting the arrival of the funds we are expecting.  As soon as it's [sic] in, I'll let you know."

#1582531 v2
099998-00004

g.   On May 17, 2010, D. Weintraub sent a fax to Raphael Maidi claiming that "I contacted the individual that owes us the funds that I've been waiting for and he assured me that I'd received something this week. As soon as I know anything, I'll let you know."

202.   Each of the aforesaid Wire Fraud Communications, as well as others, was in furtherance of the scheme to defraud alleged in this Complaint. The Weintraubs knew of and/or authorized the use of interstate, intrastate and transatlantic wire services to place such telephone calls and send such emails and telefaxes, and knew that such telephone calls, emails and telefaxes were being made in furtherance of and for the purpose of executing the scheme or were incidental to an essential part of the scheme. The use of interstate and intrastate wire services to place such telephone calls and send such emails and telefaxes furthered the scheme to defraud which was intended to and did, in fact, injure the Plaintiffs in their business and property.

## DAMAGES CAUSED BY THE RICO VIOLATION

203.   By engaging in the conduct set forth above, and conducting or participating in the conduct of the affairs of the RICO Enterprise through a pattern of racketeering activity, R. Weintraub caused the Plaintiffs to be injured in their business and property.

204.   By reason of the foregoing, the Plaintiffs are entitled to recover from R. Weintraub threefold such actual damages as the Court finds the Plaintiffs have sustained, together with the Plaintiffs cost of suit, including reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

205.   The Plaintiffs demand judgment in their favor and against R. Weintraub for threefold such actual damages as the Court finds the Plaintiffs have sustained, the

#1582531 v2
099998-00004

Plaintiffs' cost of suit, including reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c), and such additional compensatory damages, punitive damages, costs of suit and other relief as the Court deems just and equitable.

### TENTH CAUSE OF ACTION
### (RICO - 18 U.S.C. § 1962(b))

206.   Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

### CONTROL OF THE ENTERPRISE

207.   At all times relevant hereto, the Weintraubs, individually, were "persons" within the meaning of 18 U.S.C. §§ 1961(3) and insiders, directors, officers, principals and/or shareholders of Schmidt.

208.   As previously alleged, at all relevant times hereto, the RICO Enterprise, as discussed in more detail in paragraphs 196 through 226, above, was an "enterprise" engaged in or the activities of which affected interstate or foreign commerce within the meaning of 18 U.S.C. § 1961(4).

209.   The RICO Enterprise had an existence separate and apart from the particular instances of racketeering activity described herein that was controlled by the Weintraubs.  In particular, the Weintraubs were members of and/or were associated-in-fact with an "enterprise" consisting of all of them or, in the alternative, Schmidt existed as a corporate entity and the Weintraubs controlled it in their roles as owners, directors, officers and/or employees of Schmidt, in violation of 18 U.S.C. § 1962(b).

### THE PATTERN OF RACKETEERING ACTIVITY

210.   Beginning no later than 2008 and continuing until early 2010, the Weintraubs were members of and were employed by or associated-in-fact with the

#1582531 v2
099998-00004

RICO Enterprise, and did conduct or participate, directly or indirectly, in the conduct of the affairs of the RICO Enterprise through a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(1).

211.    The Weintraubs were able to commit and aid and abet the racketeering activity described below by virtue of their control over the affairs of the RICO Enterprise.  These offenses were committed as part of racketeering activity in that they had the same or similar purposes, results, participants, victims and/or methods of commission, and include two or more related individual offenses which were separate in time and committed with the express intention and common design and purpose of (i) fraudulently obtaining the Stones described above from the Plaintiffs at times when the Weintraubs specifically intended not to pay for same, but rather to convert and sell said property and retain the proceed of such sales for the benefit of the Weintraubs individually; (ii) obtaining the Stones by false representations that said property would be held in trust, on consignment, or paid for, and misappropriating substantial assets of Plaintiffs at a time Schmidt was not able to meet its obligations to its creditors, including Plaintiffs.  (iii) repeatedly delivering bad checks, false promises of payment by mail, email, wire, fax, and verbally, and other misrepresentations regarding payment; (iv) signing and delivering promissory notes to delay creditors; (v) and committing other acts of mail and wire fraud with an actual intent to hinder, delay and defraud plaintiffs and their efforts to collect amounts due to them.  This series of related offenses extended over a substantial period of time and posed a threat of continuing activity.

#1582531 v2
099998-00004

212.   The above-alleged pattern of racketeering offenses included, among others, the separate acts and episodes of racketeering activity set forth herein, namely, the Mail Fraud Communications, the Wire Fraud Communications, and the resulting fraudulent obtaining and conversion of the Stones.

213.   The acts of mail fraud and wire fraud detailed elsewhere in the Complaint occurred in a continuous pattern, beginning no later than 2008 and continuing until early 2010, when the Plaintiffs began communicating with one another and the Weintraubs' fraud and pattern and practice of racketeering activity was discovered.

## MAIL FRAUD

214.   Specific acts of fraud previously alleged in this Complaint are incorporated here by reference as if fully set forth herein.  These acts formed a pattern of fraud on the Plaintiffs that continued from at least 2006 to early 2010 in which the Weintraubs, their co-conspirators and agents, unlawfully, willfully and knowingly devised and intended to devise a scheme and artifice for inducing the Plaintiffs to deliver Stones to Schmidt even though the Weintraubs knew that Schmidt was failing and incapable of paying its debts, that the representations and undertakings they were making were false and could not be complied with, and that the Weintraubs had no intention of paying to the Plaintiffs the value of the Stones that the Plaintiffs were selling to Schmidt.  Thus, the Weintraubs obtained property from the Plaintiffs which they diverted to themselves by means of false and fraudulent pretenses, representations and promises, and through the concealment of material facts.

215.   The Weintraubs and their co-conspirators and agents unlawfully, willfully and knowingly, and for purposes of executing and attempting to execute, the scheme

#1582531 v2
099998-00004

and artifice to defraud, and for obtaining money and property from the Plaintiffs, did place and cause to be placed in post offices and authorized depositories for mail matter certain mail matter to be sent or delivered by the U.S. Postal Service and/or did deposit or cause to be deposited certain mail matter to be sent or delivered by any private or commercial interstate carrier, and did cause to be delivered by mail and/or private or commercial interstate carrier, according to the directions thereof, certain mail matter, in violation of 18 U.S.C. § 1341, including as examples, and without limitation, the Mail Fraud Communications detailed above.

216.    Each of the aforesaid Mail Fraud Communications, as well as others, was in furtherance of the scheme to defraud alleged in this Complaint.  The Weintraubs knew of and/or authorized such mailings and knew that such mailings were in furtherance of and for the purpose of executing the scheme or were incidental to an essential part of the scheme.  Each of these mailings furthered the scheme to defraud which was intended to and did, in fact, injure the Plaintiffs in their business and property.

## WIRE FRAUD

217.    From at least 2008 until 2010, the Weintraubs and their co-conspirators and agents unlawfully, willfully and knowingly, and for purposes of further executing and attempting to execute, the scheme and artifice to defraud, and for obtaining money and property from the Plaintiffs, did use interstate wire services to place interstate telephone calls, and send interstate emails and telefaxes in violation of 18 U.S.C. § 1343, including as examples, and without limitation, the Wire Fraud Communications detailed above.

#1582531 v2
099998-00004

218.    Each of the aforesaid Wire Fraud Communications, as well as others, was in furtherance of the scheme to defraud alleged in this Complaint. The Weintraubs knew of and/or authorized the use of interstate, intrastate and transatlantic wire services to place such telephone calls and send such emails and telefaxes, and knew that such telephone calls, emails and telefaxes were being made in furtherance of and for the purpose of executing the scheme or were incidental to an essential part of the scheme. The use of interstate and intrastate wire services to place such telephone calls and send such emails and telefaxes furthered the scheme to defraud which was intended to and did, in fact, injure the Plaintiffs in their business and property.

## DAMAGES CAUSED BY THE RICO VIOLATION

219.    By engaging in the conduct set forth above, and conducting or participating in the conduct of the affairs of the RICO Enterprise through a pattern of racketeering activity, R. Weintraub, caused the Plaintiffs to be injured in their business and property. Specifically, by their use of the proceeds of the sale of the Stones, that they obtained and converted from the Plaintiffs, R. Weintraub was able to gain control of and perpetuate the RICO Enterprise that affected interstate and/or international commerce, and continue to obtain and convert assets owned by the Plaintiffs.

220.    By reason of the foregoing, the Plaintiffs are entitled to recover from R. Weintraub threefold such actual damages as the Court finds the Plaintiffs have sustained, together with the Plaintiffs cost of suit, including reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

221.    The Plaintiffs demand judgment in their favor and against R. Weintraub for threefold such actual damages as the Court finds the Plaintiffs have sustained, the

#1582531 v2
099998-00004

Plaintiffs' cost of suit, including reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c), and such additional compensatory damages, punitive damages, costs of suit and other relief as the Court deems just and equitable.

### ELEVENTH CAUSE OF ACTION
### (RICO - 18 U.S.C. § 1962(d) Conspiracy to Violate RICO)

222.   Plaintiffs re-allege and incorporate by reference the foregoing paragraphs of the Complaint as if set forth fully herein.

223.   Beginning no later than 2008, the Weintraubs combined, conspired and agreed together and with each other to commit the aforementioned violations of 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

224.   Beginning no later than 2008, the Weintraubs conspired and agreed together and with each other to commit the aforementioned violations of 18 U.S.C. § 1962(b), in violation of 18 U.S.C. § 1962(d).

225.   In furtherance of the aforementioned conspiracy and to effect the objects thereof, the conspirators committed the overt acts described above, among others.

226.   By engaging in the conduct set forth above, and conspiring to conduct or participate in the conduct of the affairs of the RICO Enterprise through a pattern of racketeering activity, the Weintraubs both indirectly and directly, caused the Plaintiffs to be injured in their business and property.

227.   By reason of the foregoing, the Plaintiffs are entitled to recover from R. Weintraub threefold such actual damages as the Court finds the Plaintiffs have sustained, together with Plaintiff's cost of suit, including reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

#1582531 v2
099998-00004

228.   The Plaintiffs demand judgment in their favor and against R. Weintraub
for threefold actual damages as the Court finds the Plaintiffs have sustained, the
Plaintiffs' cost of suit, including reasonable attorneys' fees, pursuant to 18 U.S.C.
§ 1964(c), and such additional compensatory damages, punitive damages, costs of
suit and other relief as the Court deems just and equitable.

<div align="center">

**TWELFTH CAUSE OF ACTION**
**(Alter Ego/Corporate Veil Piercing Against R. Weintraub)**

</div>

229.   Plaintiffs re-allege and incorporate by reference the foregoing paragraph
of the Complaint as if set forth fully herein.

230.   Throughout the course of the events described above, inclusive of the
occurrence of the Mail Fraud Communications and the Wire Fraud Communications,
each of D. Weintraub and R. Weintraub organized and operated Schmidt in a manner
so as to make Schmidt a mere instrumentality or business conduit of each of the
Weintraubs.

231.   Without limitation, the Weintraubs used Schmidt's long-standing
reputation as a reputable dealer in the diamond and jewelry industries to fraudulently
induce the Plaintiffs to deliver Stones to Schmidt and the Weintraubs at times when
the Weintraubs held the present intention to (i) not pay for the Stones and convert the
same to their own use and benefit; (ii) hinder, delay and defraud the Plaintiffs in their
efforts to collect amounts due as aforesaid by using the pattern and practice of the
Mail Fraud Communications and the Wire Fraud Communications; and (iii) sell the
Stones, often at deep discounts, and retain the proceeds thereof personally.

#1582531 v2
099998-00004

232.   In fact, the Weintraubs did convert the Stones, sold the same, retained the proceeds of those sales for their own use and benefit, and hindered, delayed and defrauded the Plaintiffs in the process.

233.   Moreover, by converting the Stones and the proceeds of the sale thereof to their own use and benefit, the Weintraubs commingled their personal assets with the cash proceeds that were properly the property and assets of Schmidt, and that should have been available to pay the Plaintiffs as Schmidt's creditors.

234.   The Weintraubs' actions in converting the Stones and the proceeds of the sales thereof were reasonably calculated to render Schmidt insolvent and incapable of paying its debtors to the Plaintiffs, and the Weintraubs knew or should have known, at all relevant times, that their actions would so render Schmidt insolvent.

235.   Accordingly, the Weintraubs so dominated and controlled Schmidt, as the subservient corporation, to perpetrate fraud, to accomplish injustice and/or to circumvent the law.

236.   For these reasons, R. Weintraub and Schmidt are alter egos of one another, and the Court should pierce the corporate veil to impose Schmidt's liabilities to each of the Plaintiffs upon R. Weintraub.

## THIRTEENTH CAUSE OF ACTION
### (Conversion Against Defendants)

237.   Plaintiffs re-allege and incorporate by reference the foregoing paragraph of the Complaint as if set forth fully herein.

238.   The Stones delivered by the Plaintiffs to Schmidt as detailed above are specifically identifiable diamonds, other gemstones and jewelry items that are the property of the Plaintiffs by virtue of the Defendants' and D. Weintraub's failure and

#1582531 v2
099998-00004

refusal to pay the contractual value of said property and/or willful retention and/or resale of said property despite non-payment to Plaintiffs and/or the Plaintiffs' various demands for return of said property.

239.   D. Weintraub and R. Weintraub, as the principals and officers of Schmidt, have dominated and controlled Schmidt in the unlawful retention of Plaintiffs' property, so that D. Weintraub and R. Weintraub have themselves unlawfully retained said property.

240.   The Stones delivered by the Plaintiffs to Schmidt as detailed above are the property of the Plaintiffs, and the Plaintiffs have an immediate right to possession of said Stones.

241.   By various communications detailed in the foregoing Counts, Plaintiffs demanded that the Defendants and D. Weintraub either pay for or return the Stones described above, which demand has been refused.

242.   By withholding and refusing to release the Stones described above, the Defendants, acting in concert with D. Weintraub, have exercised unauthorized dominion over such assets to the exclusion of the Plaintiffs' rights, and have converted said property.

243.   As a result of the Defendants' unlawful conversion of the Plaintiffs' assets, acting in concert with D. Weintraub, the Plaintiffs have sustained damages in an amount of not less than $4,304,073.70 to be determined at trial, plus interest.

### FOURTEENTH CAUSE OF ACTION
#### (Unjust Enrichment Against All Defendants)

244.   Plaintiffs re-allege and incorporate by reference the foregoing paragraph of the Complaint as if set forth fully herein.

#1582531 v2
099998-00004

245.   The Defendants, acting in concert with D. Weintraub, have failed and refused to pay the Plaintiffs the full amounts set forth above and due to each of the Plaintiffs for the invoiced value of the Stones sold and delivered to Schmidt and converted by the Defendants and D. Weintraub, and have thus been unjustly enriched in said amounts.

246.   Accordingly, all amounts due from the Defendants to the Plaintiffs remain due, outstanding, overdue and in default.

247.   The Defendants remain liable to the Plaintiffs for the full amounts due as aforesaid.

248.   The Plaintiffs have been damaged in said amounts as a result of the Defendants' failure to pay all amounts due, acting in concert with D. Weintraub, and their consequent unjust enrichment.

## FIFTEENTH CAUSE OF ACTION
### (Unlawful Deceptive Practices - General Business Law § 349 Against Defendants)

249.   Plaintiffs re-allege and incorporate by reference the foregoing paragraph of the Complaint as if set forth fully herein.

250.   The pattern and practice of deceptive, fraudulent and unlawful actions committed by the Weintraubs and Schmidt in their transactions with the Plaintiffs detailed in this Complaint, including without limitation the Mail Fraud Communications and the Wire Fraud Communications, constitute unlawful "deceptive acts or practices in the conduct of any business, trade or commerce . . . in this state" prohibited by N.Y. General Business Law § 349.

251.   Said unlawful deceptive acts and practices were consumer oriented and were misleading in a material manner, all as detailed above.

#1582531 v2
099998-00004

252.   As a result of the Defendants' unlawful deceptive acts and practices, acting in concert with D. Weintraub, the Plaintiffs have suffered injury and resultant damages in the amount of not less than all amounts due to the Plaintiffs as set forth above.

## SIXTEENTH CAUSE OF ACTION
### (Conspiracy to Commit Fraud Against R. Weintraub)

253.   Plaintiffs re-allege and incorporate by reference the foregoing paragraph of the Complaint as if set forth fully herein.

254.   As set forth above, R. Weintraub and D. Weintraub, using Schmidt as their instrumentality and alter ego, engaged in an elaborate and sustained enterprise to defraud Plaintiffs and deprive them of their property.

255.   R. Weintraub and D. Weintraub entered into an agreement to so defraud and deprive Plaintiffs of their property, and thus conspired to defraud Plaintiffs.

256.   As a result of that conspiracy and fraud, the Plaintiffs have suffered injury and resultant damages in the amount of not less than all amounts due to the Plaintiffs as set forth above.

**WHEREFORE**, the Plaintiffs respectfully requests judgment as follows:

(a)   Against the Defendants, jointly and severally, in the amount of not less than $4,304,073.70 , plus interest, expenses and attorneys' fees, as damages for breach of contract as aforesaid;

(b)   Against R. Weintraub for treble damages for RICO violations, plus interest, expenses and attorneys' fees;

(c)   Against R. Weintraub in an amount of not less than $4,304,073.70, plus interest, expenses and attorneys' fees, resulting from R. Weintraub domination and abuse of Schmidt that renders Schmidt the mere instrumentality and alter ego of R. Weintraub, thus rendering R. Weintraub liable for Schmidt's debts to the Plaintiffs;

#1582531 v2
099998-00004

(d)    Against the Defendants, jointly and severally in an amount of not less than $4,304,073.70 to be determined at trial, plus interest, expenses and attorneys' fees, as damages for conversion;

(e)    Against R. Weintraub in an amount of not less than $4,304,073.70 to be determined at trial, plus interest, expenses and attorneys' fees, as damages for unjust enrichment;

(f)    Against R. Weintraub in an amount of not less than $4,304,073.70 to be determined at trial, plus interest, expenses and attorneys' fees, as damages for deceptive business practices;

(g)    Against R. Weintraub in an amount of not less than $4,304,073.70 to be determined at trial, plus interest, expenses and attorneys' fees, as damages for conspiracy to commit fraud; and

#1582531 v2
099998-00004

(h)    For such other and further relief as the Court may deem just and proper.

Dated:   New York, New York
         July 11, 2012

GIBBONS P.C.
One Pennsylvania Plaza, 37th Floor
New York, New York 10119-3701
(212) 613-2000

Attorneys for Plaintiffs Tiffany and
Company; LILI Diamonds USA Inc.;
Ronnie Roubin; Graff Diamonds
(U.S.A.) Inc. n/k/a Graff Diamonds (New
York) Inc. and Oscar Heyman Inc.

By:_____
       Dale E. Barney
       Jeffrey S. Berkowitz


Ben Kinzler, Esq.
130 West 42d Street, 25th Floor
New York, New York 10036
(212) 768-8700

Attorneys for Plaintiff Fischer Diamonds
Inc. and V.F. Diamonds Ltd.


By:_____
       Ben Kinzler

#1582531 v2
099998-00004

(h)    For such other and further relief as the Court may deem just and proper.

Dated:   New York, New York
         July 11, 2012

GIBBONS P.C.
One Pennsylvania Plaza, 37th Floor
New York, New York 10119-3701
(212) 613-2000

Attorneys for Plaintiffs Tiffany and
Company; LILI Diamonds USA Inc.;
Ronnie Roubin; Graff Diamonds
(U.S.A.) Inc.; and Oscar Heyman Inc.


By:_____
        Dale E. Barney
        Jeffrey S. Berkowitz


Ben Kinzler, Esq.
130 West 42d Street, 25th Floor
New York, New York 10036
(212) 768-8700

Attorneys for Plaintiff Fischer Diamonds
Inc. and V.F. Diamonds Ltd.


By:_____
        Ben Kinzler

61

#1582531 v2
099998-00004